**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3864-16T4

CITY OF CAMDEN,

      Plaintiff-Appellant,

v.

CWA LOCAL 1014 and
RODNEY WEARING,

      Defendants-Respondents.

_____

Argued March 15, 2018 – Decided September 26, 2018

Before Judges Simonelli, Haas and Rothstadt.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1345-17.

Michael J. Watson argued the cause for appellant (Brown & Connery, LLP, attorneys; Michael J. Watson, on the briefs).

James Katz argued the cause for respondents (Spear Wilderman, PC, attorneys; James Katz, on the brief).

PER CURIAM

Plaintiff City of Camden (City) appeals from the May 5, 2017 Law Division order, which denied its motion to vacate an arbitration award requiring the City to provide severance pay and retiree health benefits to defendant Rodney Wearing, and confirmed the award.[1]  For the following reasons, we affirm.

I.

Wearing was employed as a heavy laborer with the City's Department of Public Works (DPW) from September 1984, until August 2016.  As of August 25, 2016, he had more than twenty-five years of service with the City and more than twenty-five years of service credit with the Public Employees' Retirement System (PERS).

Wearing's employment was governed by a collective bargaining agreement (CBA) between the City and defendant CWA Local 1014 (the Union).

_____

[1]  The City did not address the trial court's confirmation of the award of severance pay in its merits brief, and stated in its amended reply brief that it's "appeal does not seek this [c]ourt's review of the [a]ward with regard to Wearing's [s]everance [b]enefits."  The issue regarding the award of severance pay was appealable notwithstanding the trial court's stay of payment.  Thus, the issue is deemed waived.  N.J. Dep't of Envtl Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015) (citation omitted); see also Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2018).

CBA Article IX.B provides, in pertinent part: "If an employee leaves the service of the City after January 1st, but prior to December 31st, in good standing, such employee shall receive longevity pay based on their length of service, prorated, and paid at time of termination" (emphasis added).  CBA Article XIV.B provides that an employee with more than twenty-five years of service shall receive five full weeks of severance pay.  CBA Article XV.B provides that continued health benefits for a retiree "is established by Chapter 57 of the Camden Code."

Camden Code § 57-2.A requires the City to provide continued health benefits to retirees from the date of retirement to age sixty-five.  Camden Code § 57-3.B requires the City to provide continued health benefits to employees who have retired after twenty-five years or more of service credit in a State retirement system and not less than twenty-five years of service to the City. Camden Code § 57-3.D, which is at issue here, provides that "employees . . . are not entitled to continued health benefits if the employee is separated for cause by the City . . . for an incident that took place prior to the approval date of his/her retirement . . . pension."

Pursuant to the City's policy, DPW employees are subject to random drug testing on a periodic basis.  On July 16, 2013, Wearing was selected for a random drug test, and tested positive for drugs.  On July 29, 2013, Wearing and the City

3

entered into a "Last Chance Agreement," which the City claimed provided that Wearing would be terminated from his employment if he tested positive for drugs or alcohol or refused to submit to a drug or alcohol test. Wearing denied the agreement provided for his termination if he tested positive for drugs or alcohol or refused to submit to a drug or alcohol test.[2]

On Saturday, August 6, 2016, Wearing's son was shot and hospitalized. Commencing the week of August 8, 2016, Wearing took approved vacation leave to care for his son. Wearing was his son's primary caretaker, and his son was released into his care from the hospital.

According to the City, on August 22, 2016, Wearing came to work at the Parks and Recreation building and was transported to the DPW building. The DPW's assistant superintendent, Mitchell Richardson, advised the City's Director of Public Works, Patrick Keating, that Wearing requested vacation leave. Keating advised Richardson that Wearing was scheduled for a drug test and had to take the test that morning. Wearing then called Keating and said he was taking vacation, effective immediately. Keating told Wearing he was on the list for a random drug test and had to take the test. Wearing left without

---

[2] If the "Last Chance Agreement" was in writing, the City has not provided it on appeal.

taking the drug test. According to Wearing, he went to the Parks and Recreation Building on August 22, 2016, not to work, but to obtain additional time off to care for his son. The parties stipulated that Wearing received vacation pay for August 22, 23, 24 and 25, 2016.

On August 25, 2016, Wearing submitted to Keating and the City's Business Administrator an "irrevocable letter of retirement," which stated:

> After [thirty-two] years of service with the City . . . <u>I am hereby providing my irrevocable notice of retirement effective August 25, 2016 due to recent events involving my family. I have already submitted a pension application to the New Jersey Division of Pensions and Benefits. I do not intend to return to work.</u>
>
> Please advise the appropriate City representatives of my retirement. I ask that the necessary steps be taken in order to provide me with benefits afforded retirees through the CWA Local 1014 contract with the City. Your anticipated cooperation with this request is greatly appreciated.
>
> [(Emphasis added).]

Also on August 25, 2016, Wearing filed a retirement application with PERS, which listed August 25, 2016 as his last day of employment with the City, and the Union's president advised Keating that Wearing filed the application that day and would not be returning to work. The CBA did not require him to take any further action for his "irrevocable letter of retirement" to become effective

5 <span>A-3864-16T4</span>

on August 25, 2016. Wearing did not return to work thereafter, and there was no evidence he was required to do so. PERS approved his pension application on September 21, 2016, retroactive to September 1, 2016, which was the earliest date he could begin receiving pension payments pursuant to N.J.A.C. 17:2-6.1.[3]

In connection with his retirement, in an August 26, 2016 letter, the Division of Pension and Benefits (Division) offered Wearing the opportunity to enroll in health benefits coverage through the Retired Group of the State Health Benefits Program "based on [his] retirement from full-time employment." The letter also indicated that Wearing may be eligible for employer paid health benefits.

At the time Wearing submitted his "irrevocable letter of retirement" and pension application, he had not been served with a notice of disciplinary action seeking removal from employment, was not advised the City was seeking his removal, and Keating had not prepared a report requesting that the City discipline Wearing. The City presented no evidence that on August 25, 2016, Wearing was aware it contemplated disciplinary action against him. Notably, the City stipulated that Wearing received a pro rata share of longevity pay for

---

[3] Pursuant to N.J.A.C. 17:2-6.1(a), regardless of the day of the month the employee permanently ceases employment, the earliest a retirement can become effective and pension checks commence is the first day of the following month.

eight months in 2016, up to the week of August 19, 2016. Wearing was only entitled to longevity pay under the CBA Article IX if he left his employment in good standing.

Nevertheless, on August 26, 2016, Keating issued a report, detailing the incident on August 22, 2016, confirming that Wearing had "been out of work for the past two weeks because his son had been shot and wounded[,]" and recommending that the City suspend Wearing, retroactive to August 22, 2016, pending a disciplinary hearing. Keating did not recommend Wearing's removal.

On August 26, 2016, the City issued a Preliminary Notice of Disciplinary Action (PNDA), which notified Wearing the City sought his suspension or removal under N.J.A.C. 4A:2-2.3(a) for insubordination, conduct unbecoming a public employee, neglect of duty, and other sufficient causes, "including violation of the City['s] . . . Municipal Personnel Policies, Chapter III, Section 9, Substance Abuse; Chapter III, Section 10, Drug and Alcohol Screening Policy; and Violation of Agreement." The PNDA based the charges on the "Last Chance Agreement" and incident on August 22, 2016. The PNDA was mailed to Wearing by certified or registered mail on August 26, 2016.

Following a departmental hearing, the hearing officer recommended Wearing's removal from employment, effective August 22, 2016. On October

7, 2016, the City issued a Final Notice of Disciplinary Action (FNDA), removing Wearing from his employment, retroactive to August 22, 2016.[4] Wearing was already receiving his pension benefits by the time the City issued the FNDA.

The City did not respond to the Union's letters asking it to provide retiree benefits to which Wearing was entitled under the CBA. As a result, the Union filed a grievance on Wearing's behalf, asserting he was entitled to severance pay and retiree health benefits under the CBA. After the City denied the grievance, the Union filed a demand for arbitration with the Public Employment Relations Commission.

At the arbitration, the City confirmed that the merits of Wearing's removal was not before the arbitrator. The City asserted that Wearing was not entitled to severance pay because he did not terminate his employment voluntarily. Rather, he was terminated based on the issuance of the PNDA on August 26, 2016, which resulted in the FNDA on October 7, 2016, terminating his employment for cause retroactive to August 22, 2016. The City also asserted that Wearing was not entitled to retiree health benefits because he was

---

[4] Wearing appealed his removal to the Civil Service Commission and subsequently withdrew the appeal.

terminated for cause for an incident that took place on August 22, 2016, prior to PERC's approval of his retirement pension on September 1, 2016.

The City argued that accepting Wearing's claim he retired on August 25, 2016, based on his "irrevocable letter of retirement" would lead to an impractical "paper race" where an employee could race to submit a letter of retirement before the City could take disciplinary action in order to immunize himself from the City's claim it separated the employee for cause. The City also argued there would be no deterrent against misconduct for retirement-eligible employees if this practice were allowed. Lastly, citing administrative cases,[5] the City argued it could apply a termination date retroactively to the date the misconduct occurred.

In a March 21, 2017 opinion and award, the arbitrator determined that Wearing was entitled to severance pay. The arbitrator found:

> The undisputed facts establish that . . . Wearing submitted an "irrevocable letter of retirement" with the City on August 25, 2016. It was received by the City on that date, the City was advised of same orally on that date. . . . Wearing filed for retirement with the State of New Jersey on that date and never returned to work thereafter as an employee of the City. There is no evidence that he remained employed after August 26,

---

[5] The City cited In the Matter of Ciuppa, 2014 N.J. AGEN LEXIS 206 (May 16, 2013); In the Matter of Love, 2007 N.J. AGEN LEXIS 828 (Nov. 14, 2007) and Burke v. Twp. of Washington, 1999 N.J. AGEN LEXIS (Mar. 2, 1999).

2016 or that his separation from employment was contingent on City approval nor is there any evidence that the City rejected his termination of employment . . . Wearing's retirement filing on August 25, 2016 was received and responded to by the Division of Pensions and benefits on August 26, 2016 and processed to finality based upon his decision to terminate his employment on August 25, 2016 due to retirement.

The arbitrator found no merit in the City's argument that Wearing's employment was not terminated voluntarily, but rather, he was terminated based on the issuance of the PNDA. The arbitrator determined:

There is no record evidence that at the time of . . . Wearing's separation from employment the City ever indicated to him or anyone else that disciplinary action was either contemplated or would be taken against him despite three days having passed since the alleged incident occurred. The [PNDA] was not issued until the following day. His length of service entitled him to severance pay pursuant to the negotiated schedule of payments and the City violated Article XIV.B.2 when it did not make the payment after he voluntarily separated his employment with the City because of a retirement program.

The arbitrator applied the same analysis to retiree health benefits, but under the language in Camden Code § 57-3.D. The arbitrator found the City did not contest that Wearing submitted a letter of retirement on August 25, 2016, filed a retirement application with PERS that day, and no longer worked for the

City thereafter. The arbitrator rejected the City's "paper race" argument, finding:

> the record is barren of any evidence that . . . Wearing's decision to retire, three days after August 22, 2016 and one day prior to the [PNDA], was motivated by avoiding the impact of disciplinary action that was unknown by him at the time of his letter of retirement. Moreover, . . . Wearing's personal life and the caretaking of his son resulting in uncontested paid absences from work beginning August 8, 2016 do not, in the absence of credible evidence to the contrary, suggest that his separation from employment on August 25, 2016 was a bad faith attempt to circumvent benefits due to an employee with thirty-one years of service. Any other conclusion would be speculative and based upon insufficient record evidence.

The arbitrator rejected the City's argument that Wearing was not entitled to retiree health benefits because he was terminated for cause for an incident that took place on August 22, 2016, prior to PERC's approval of his retirement pension on September 1, 2016. The arbitrator found the Division's August 26, 2016 letter granted Wearing the opportunity to enroll in New Jersey State Health Benefits "based on his retirement from full-time employment." The arbitrator also found that under N.J.A.C. 17:2-6.1(a), retirements cannot become effective until the first day of the month following receipt of the retirement application, unless the applicant seeks a later retirement date. The arbitrator did not interpret the term "approval date" in Camden Code § 57-3.D to mean the date of formal

approval of a retirement by the Division rather than the date an employee actually retires from employment with the City.

The arbitrator also rejected the City's argument that it may apply a termination date retroactively to the date the misconduct occurred. The arbitrator emphasized that Wearing retired and was no longer an employee of the City when the City issued the PNDA and FNDA. Accordingly, the arbitrator found the administrative cases the City cited in support of its argument did not apply, stating:

> In all of the cited cases, the retroactive dates for removal were tied to either the dates of the [PNDA] or shortly thereafter, and all involved matters in which the affected individual was an employee of the public employer and had not separated from employment due to retirement. In this instance, the City seeks to reach back before the [PNDA] to effectuate a retroactive discharge before . . . Wearing's retirement. Regardless of the merits or validity of the Notices of Disciplinary Action taken by the City or . . . Wearing's appeal [to the Civil Service Commission], which are not before me, such action is not supported by the precedent cited by the City.
>
> [(Emphasis added).]

The arbitrator concluded that the Union established that the City violated CBA Article XIV.B by not providing severance pay to Wearing and CBA Article XV.B by not providing continued health benefits to him after his retirement after

12

more than twenty-five years of service with the City and more than twenty-five years of service credit with the PERS.

The City filed a verified complaint and motion, seeking to vacate the arbitration award, and the Union and Wearing filed a verified counterclaim and cross-motion, seeking to confirm the arbitration award. In a May 5, 2017 order and oral opinion, the trial court denied the City's motion, granted the cross-motion, and confirmed the arbitration award "in all respects." This appeal followed.

"As the decision to vacate an arbitration award is a decision of law, [we] review[] the denial of a motion to vacate an arbitration award de novo." Manger v. Manger, 417 N.J. Super. 370, 376 (App. Div. 2010). In our de novo review, we have the right to review the record and make our own findings of fact. In re Phillips, 117 N.J. 567, 578 (1990); Grasso v Borough Council of Glassboro, 205 N.J. Super. 18, 25 (App. Div. 1985).

"Judicial review of an arbitration award is very limited." Bound Brook Bd. of Educ. v. Ciripompa, 228 N.J. 4, 11 (2017) (quoting Linden Bd. of Educ. v. Linden Educ. Ass'n ex rel. Mizichko, 202 N.J. 268, 276 (2010)). "Courts have engaged in an extremely deferential review when a party to a collective bargaining agreement has sought to vacate an arbitrator's award. The well-

established standard . . . is that 'an arbitrator's award will be confirmed "so long as the award is reasonably debatable." Policemen's Benevolent Ass'n v. City of Trenton, 205 N.J. 422, 428-29 (2011) (quoting Linden Bd. of Educ., 202 N.J. at 276).

"That high level of deference springs from the strong public policy favoring 'the use of arbitration to resolve labor-management disputes.'" Id. at 429 (quoting Linden Bd. of Educ., 202 N.J. at 275-76). "Moreover, where a collective bargaining agreement provides for binding arbitration, 'it is the arbitrator's construction that is bargained for,' and not a court's construction." Ibid. (quoting Linden Bd. of Educ., 202 N.J. at 276). "That is not to suggest that an arbitrator's award is impervious to attack." Ibid. "Indeed, it is axiomatic that an arbitrator's 'award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.'" Ibid. (quoting United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960)). "Thus, our courts have vacated arbitration awards as not reasonably debatable when arbitrators have, for example, added new terms to an agreement or ignored its clear language." Ibid.

The court may vacate an arbitration award only in these limited circumstances:

> a. Where the award was procured by corruption, fraud or undue means;
>
> b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;
>
> c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehaviors prejudicial to the rights of any party;
>
> d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.
>
> [N.J.S.A. 2A:24-8.]

The claim of error in this case implicates subsection (a), which provides for vacation of an arbitration award "[w]here the award was procured by corruption, fraud or undue means." "'[U]ndue means' ordinarily encompasses a situation in which the arbitrator has made an acknowledged mistake of fact or law or a mistake that is apparent on the face of the record[.]" Borough of E. Rutherford v. E. Rutherford PBA Local 275, 213 N.J. 190, 202 (2013) (first alteration in original) (quoting N.J. Office of Emp. Relations v. Commc'ns Workers of Am., 154 N.J. 98, 111-12 (1998)). "[A]n arbitrator's failure to follow

the substantive law may . . . constitute 'undue means' which would require the award to be vacated." In re City of Camden, 429 N.J. Super. 309, 332 (App. Div. 2013) (quoting Jersey City Educ. Ass'n, Inc v. Bd. of Educ., 218 N.J. Super 177, 188 (App. Div. 1987)).

The claim of error in this case also implicates subsection (d), which provides for vacation of an arbitration award where the arbitrator exceeded his power. An arbitrator may not exceed the power authorized by the parties' collectively negotiated agreement. Commc'ns Workers of Am., Local 1087 v. Monmouth Cty. Bd. of Soc. Servs., 96 N.J. 442, 452 (1984). "Although arbitrators may not look beyond the four corners of a contract to alter unambiguous language, where a term is not defined, it may be necessary for an 'arbitrator to fill in the gap and give meaning to that term.'" City of Trenton, 205 N.J. at 430 (quoting Linden Bd. of Educ., 202 N.J. at 277). "Furthermore, an arbitrator may 'weav[e] together" all those provisions that bear on the relevant question in coming to a final conclusion." Ibid. (alteration in original) (quoting N.J. Transit Bus Operations, Inc. v. Amalgamated Transit Union, 187 N.J. 546, 555 (2006)). "When that occurs, even if the arbitrator's decision appears to conflict with the direct language of one clause of an agreement, so long as the

contract, as a whole, supports the arbitrator's interpretation, the award will be upheld." Ibid. As our Supreme Court has held:

> Courts are not to "second-guess" an arbitrator's interpretation, because "the question of interpretation of the collective-bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."
>
> [Borough of E. Rutherford, 213 N.J. at 202 (quoting Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 433 (1996)).]

In addition, the court may vacate an arbitration award for public policy reasons. Ibid. "However, '[r]eflecting the narrowness of the public policy exception, that standard for vacation will be met only in rare circumstances.'" Ibid. (alteration in original) (quoting N.J. Tpk. Auth. v. Local 196, I.F.P.T.E., 190 N.J. 283, 294 (2007)). Public policy is ascertained by 'reference to the laws and legal precedents and not from general considerations of supposed public interests. Id. at 202-03 (quoting Weiss, 143 N.J. at 434-35).

"[E]ven when the award implicates a clear mandate of public policy, the deferential 'reasonably debatable' standard still governs. Thus, '[i]f the correctness of the award, including its resolution of the public-policy question, is reasonably debatable, judicial intervention is unwarranted.'" Id. at 203

17

(alteration in original) (quoting Weiss, 143 N.J. at 443). As the Court explained, "[a]ssuming that the arbitrator's award accurately has identified, defined, and attempted to vindicate the pertinent public policy, courts should not disturb the award merely because of disagreements with arbitral fact findings or because the arbitrator's application of the public-policy principles to the underlying facts is imperfect." Weiss, 143 N.J. at 443.

Applying the above standards, we discern no reason to disturb the arbitration award.

II.

On appeal, the City contends the record demonstrated that Wearing is ineligible for retiree health benefits under Camden Code § 57-3.D because he was terminated for cause under the Civil Service removal procedures for an incident that occurred prior to PERC's approval of his retirement pension. Thus, the City argues the arbitration award must be vacated pursuant to N.J.S.A. 2A:24-8(a) because it was based on dispositive mistakes of fact, which prevented the arbitrator from correctly applying the record to Camden Code § 57-3.D.

The City's argument focuses on its right to remove Wearing from his employment retroactively for cause in accordance with Civil Service

disciplinary regulations. However, the City cited no authority permitting it to discipline and retroactively remove a former employee under those regulations. Nor is there any such authority, as the disciplinary regulations do not apply to former employees, but "applies only to permanent employees in the career service or a person serving a working test period." N.J.A.C. 4A:2-2.1(a) (emphasis added). Only "[a]n employee" can be disciplined under the regulations. N.J.A.C. 4A:2-2.3. "Employee" is defined as "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." Black's Law Dictionary 693 (10th ed. 2014). Wearing was not an employee of the City when it issued the PNDA. Thus, he was not subject to the Civil Service disciplinary regulations, and his removal under those regulations was irrelevant to the arbitrator's determination of his grievance.

The only issue before the arbitrator was whether Wearing was contractually entitled to severance pay and retiree health benefits. The arbitrator found Wearing was entitled to severance pay, as he terminated his employment voluntarily on August 25, 2016, because of retirement, not because of the issuance of the PNDA or FNDA, or a termination for cause. The City did not

19

challenge this finding on appeal. In addition, the City does not dispute it provided longevity pay to Wearing, which he could only receive if he left his employment in good standing.

Nevertheless, there was no mistake of fact or law here. The record supports the arbitrator's finding that Wearing retired on August 25, 2016, and had twenty-five or more years of credit in a State retirement system and not less than twenty-five years of service to the City at that time. The record also supports the arbitrator's finding that Wearing was not separated from his employment for cause, but rather, he separated voluntarily on August 25, 2016 because of a retirement program, and whatever actions the City took subsequent to August 25, 2016, were contractually and legally irrelevant and inconsequential to Wearing's contractual right to retiree health benefits. Thus, the arbitrator correctly concluded the City violated CBA Article XV.B and Camden Code § 57-3.A and B in denying Wearing retiree health benefits.

Having reached this conclusion, we need not address the City's argument that the arbitrator exceeded his authority under the CBA by relying on his self-defined "actual date of retirement" instead of the "approval date" of Wearing's retirement application as stated in Camden Code § 57-3.D.

However, we address the City's contention that the arbitration award must be vacated under N.J.S.A. 2A:24-8(a) because arbitrator and trial court made a mistake of law by considering Wearing's motivation to avoid discipline as a dispositive legal issue. The City argues that Wearing's motivation to avoid discipline was immaterial to a proper analysis of Camden Code § 57-3.D. We disagree. Wearing's motivation was not immaterial to a proper analysis of Camden Code § 57-3.D, as it was directly relevant to the validity of his August 25, 2016 "irrevocable letter of retirement." If Wearing knew the City was going discipline him and his motivation in retiring was solely to "beat the clock" to obtain continued health benefits, then the outcome may have been different. However, as the arbitrator found, the record was devoid of evidence that at the time he submitted his "irrevocable letter of retirement" and retired, Wearing knew the City contemplated disciplinary action against him or that his decision to retire was motivated by avoiding the impact of disciplinary action. Thus, there was no mistake of law warranting vacation of the arbitration award.

### III.

The City contends the award of retiree health benefits to Wearing is contrary to public policy because it supersedes a Civil Service employer's right to discipline and remove employees who commit misconduct and ignores this

21

court's warning against allowing a "beat the clock" and "paper race" mentality in the public employment context.[6]

The City's relies on on <u>Port Authority Police Sergeants Benevolent Ass'n of N.Y., N.J. v. Port Authority of N.Y., N.J.</u>, 340 N.J. Super. 453 (App. Div. 2001), to support this argument. There, a police officer allegedly brandished his weapon at a third party while off duty. <u>Id.</u> at 454. A warrant was issued for his arrest, he was suspended without pay, and a grand jury indicted him. <u>Ibid.</u> He voluntarily retired prior to the institution of departmental disciplinary proceedings and resolution of the criminal charges. <u>Id.</u> at 454-55. A jury found him not guilty of the criminal charges. <u>Id.</u> at 455.

An arbitrator found the officer was entitled to back pay from the date of his suspension until the date of his retirement. <u>Id.</u> at 456. We reversed, finding that:

> The arbitrator failed to consider the ramifications of her decision on the public interest. Her decision basically encourages suspended police officers, who face both criminal and departmental charges, to remain on

---

[6] We decline to address the City's additional argument that Wearing did not resign in good faith, as he did not provide fourteen days' notice prior to resigning, in violation of N.J.A.C. 4A:2-6.1(a) and N.J.A.C. 4A:2-6.2(2), which prevents him from obtaining benefits. The City did not raise this issue before the arbitrator and trial court, it is not jurisdictional in nature, and it does not substantially implicate the public interest. <u>Zaman v. Felton</u>, 219 N.J. 199, 226-27 (2014) (citation omitted).

suspension for a protracted period of time while disciplinary charges are prepared. However, just before such charges are resolved, the officers can conveniently retire, safe in the knowledge that if they successfully defend against the pending criminal charges, they will reap a financial windfall in the form of back pay from the date of their initial suspensions. By employing this strategy, they will have successfully undermined the department's ability to prosecute the disciplinary charges pending against them, and the department will have lost, by virtue of the voluntary retirement, the opportunity to eliminate any back pay award, one of the remedies available in the disciplinary forum. The public interest would thereby be subverted.

[Id. at 461-62.]

The City also relies on New Jersey Highway Authority v. International Federation of Professional and Technical Engineers, Local 193, 274 N.J. Super. 599 (App. Div 1994). There, the employee was arrested for admittedly stealing toll receipts and charged with theft. Id. at 603-04. The employer suspended him without pay, issued disciplinary charges against him, and informed him there would be a disciplinary hearing. Id. at 604. Prior to the hearing, the employee tendered a letter of resignation, asking the employer to accept his resignation. Id. at 604-05. The employer rejected his resignation and, after a hearing, found him guilty of the charges and terminated his employment. Id. at 605.

In vacating the arbitrator's award in the employee's favor, we noted the arbitrator acted contrary to the public interest by failing to recognize the purpose

and effect of the employee's suspension without pay pending a disciplinary hearing, which occurred prior to the employee's attempt to resign. Id. at 610. We determined the arbitrator should have found the disciplinary hearing effectively terminated the employee as of the date of his arrest, and thus, the employee's attempted resignation after that date is ineffective. Id. at 610-11. We concluded:

> in awarding sick benefits, the arbitrator in essence granted [the employee] a two month cushion to put his affairs in order prior to bearing any responsibility for his breach of public trust. The effect was to allow a race to resignation before the grievance machinery could conclude. To put the point differently, the arbitration award condoned a "beat the clock" mentality, i.e., could NJHA have afforded [the employee] a full and fair hearing before he sought to vest his benefits and before imposition of any penalties or exclusionary provisions contained in the contract. In our view such action cannot allow a defalcating public employee to betray the public trust by stealing public funds and avoid any impact with regard to his benefits. Public policy militates against such a result.
>
> [Id. at 611-12 (footnote omitted).]

In contrast, at the time Wearing submitted his "irrevocable letter of retirement," he was not suspended, did not face criminal and departmental charges or a departmental hearing. In addition, there was no evidence whatsoever that he knew the City contemplated disciplinary action against him

or that he retired to "beat the clock" to avoid disciplinary action. The competent evidence in this case shows clearly that Wearing retired to care for his son. We are satisfied the arbitration award did not contravene a clear mandate of public policy.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25

A-3864-16T4